## No. 8980.

### SNYDER *v.* HAMILTON NATIONAL BANK.

1. APPEAL AND ERROR.—Findings Supported by Evidence, will not be disturbed.
2. BANK—*Accepting Check Drawn Upon Itself.*—A bank is presumed to know whether a check drawn upon itself is good, and if it pays it, or credits it to a depositor's account, it will not be allowed to afterwards change its position and repudiate the check, without an agreement express or implied, to the contrary. The evidence examined and the bank held justified in charging back to a depositor a check drawn upon itself, and for which the depositor had received credit.

*Error to Denver District Court, Hon. George W. Allen, Judge.*

Mr. CHARLES K. PHILLIPS, Mr. WILLIAM A. REEF, for plaintiff in error.

Messrs. BARDWELL, HECOX, McCOMB & MEANS, for defendant in error.

Chief Justice Hill delivered the opinion of the court.

The plaintiff in error seeks to recover from the defendant in error bank $1,750.00, which he alleges was the amount he had on deposit in the bank, subject to check, on November 26, 1915. Trial was to the court, which found the issues in favor of the defendant bank, and gave it judgment for costs.

The record discloses, that on September 17, 1915, the plaintiff opened an account with defendant by depositing $100.00; that prior to September 29th, following, he had given checks upon this deposit in the sum of $99.30, leaving

a balance due him of seventy cents; that previous to said September 29th, Timothy Ross and Alfred Dunham were engaged in a real estate transaction, or negotiations pertaining to a partial exchange and sale of properties, whereby the plaintiff was to receive a commission; that under the assumption that the deal had been consummated, Dunham gave to Ross, in Denver, two checks on a Tulleride bank, payable to Ross, for $4,000.00 and $6,000.00, respectively, dated September the 29th, 1915; that on the same day Ross gave to plaintiff checks on defendant bank for $1,000.00 and $1,500.00 respectively, in part payment for plaintiff's services in the real estate deal; that at the time of giving these checks Ross had but a small amount on deposit in defendant bank, but upon the same day, and at or about the same time, he deposited in the defendant bank to his credit the $4,000.00 Dunham check; that upon the same day and at or about the same time, the plaintiff deposited to his credit in the defendant bank the two Ross checks hereinbefore referred to; that on the same day, the plaintiff drew a check on his account in defendant bank to the Colorado State Savings bank for $800.00; that before accepting it, the cashier of this bank phoned the defendant bank asking if it was good, and received an answer from some one that it was; that this $800.00 check was paid by defendant bank upon the same day. Thus far there is no conflict in the testimony. From this point on that of the plaintiff and the agents of the defendant differ materially. Mr. Weckbach, the defendant's assistant cashier, testified, in substance, that early on the morning of September 30th, 1915, Mr. Dunham, or his attorney, called at the defendant bank and notified the witness that Dunham had stopped payment on the $4,000.00 check to Ross; that the witness immediately notified Mr. Burger, the defendant's cashier, of this fact. Mr. Burger testified, in substance, that after receiving this information he, upon the morning of September 30th, notified the plaintiff that the checks which Ross had given him were not good because they had been notified by the maker that payment had been stopped on the Dunham check, and that they would want

him to make good the amount already honored on his check, viz., $800.00; that the Dunham check was recharged to the Ross account, and the Ross checks recharged to the plaintiff's account; that the Dunham check was in due time returned endorsed "payment stopped," but that he acted in the matter immediately upon being notified that Dunham had stopped payment on it, and before its return; that in response to his demand upon plaintiff that he make the $800.00 overdraft good plaintiff said he would do so, he would make it good, etc.; that he had redeemed a debt he had at the Colorado State and Savings Bank, had redeemed some diamonds, and he would make the account good by getting the diamonds and putting them in defendant bank; that he came back and brought the collateral; that he gave his note to the defendant bank for $795.30 to square up the account, thus closing it; that he put up with the note, as collateral, certain diamonds; that thereafter he borrowed from defendant bank $100.00 or $150.00 more, which he repaid, and paid some little interest on the other; that thereafter when it became due, he renewed the note or gave two new notes rather in lieu thereof, and that the defendant held these notes at the time plaintiff brought this suit; that all of these notes were payable to the defendant bank. The witness also testified that he secured a note from Mr. Ross payable to the bank for $1,500.00 as collateral upon the note of Mr. Snyder given for the purpose of paying up Snyder's deficiency; that this Ross note was obtained at Snyder's request; that, on the morning of September 30th when he notified Snyder of his deficiency and the reason for it, Snyder asked the witness to get Ross to pay it, and that he, Burger, told him he would try to get the money from Ross; that in pursuance of his efforts under such promise Ross told the witness that he would get the money in ten days, and that he gave to the witness the $1,500.00 note payable to the bank; that he took this note for the protection of the plaintiff and at his request.

The plaintiff testified that when he deposited the Ross checks he said: "Mr. Burger, I have some debts that are past due, can I check on this to do it?" that he, Burger,

said: "Sure, this is as good as wheat." He admits that he was notified by Burger of the stoppage of payment on the Dunham check, etc.; he also admits the giving of the original note, and the putting up of the collateral as security for it, which note would represent the amount of his overdraft in defendant bank, were the two Ross checks properly recharged to him. He also admits the giving thereafter of the renewal or new notes representing the purported obligation. His explanation for giving the first note is that on the morning of September 30th, Mr. Burger told him that Dunham had stopped payment upon a check that had got him into difficulty, etc.; that the transaction had got him into trouble with his directors and he said "I wish you would help me out, in some way. I will get the money out of Ross. I am going to get the money out of Ross and Dunham. Dunham is the man. I want you to help me out some way, as a personal accommodation, so I can get the money out of Ross * * *" that Burger wanted to know if he would not go and get some collateral, and put up there with him, personally, so he could not get in trouble with his directors; that he then said, "In the meantime, I had talked it over with my friend, I went back the next morning and he still insisted I could get some collateral, and I went and got collateral, and went on my note and when I got him that collateral I said 'Mr. Burger, hold this collateral in your hands, and don't mix it with the bank's interest. I am doing this as a personal accommodation to you, and you get the money out of Ross'"; that Burger called him the next day and said "I think I have saved myself and you, too, I have taken Ross' note for the amount for ten days. We have known Ross, he always pays his bills. He is sometimes slow but never refuses to pay his bills. I have his note, as soon as that it paid you can have your money." The witness admits that he renewed his note to the bank on November 24th, by giving two notes, and paid some interest on them, but said "I do not know of making the notes to the Hamilton National Bank, I was endeavoring to aid Mr. Burger in view of his own suggestion to keep him out of difficulty with his directors, and to

give him time; Mr. Burger was a stranger to me. * * * Mr. Ross was absolutely a stranger to me." Referring to Exhibits 1 and 2 which were the renewal notes executed by the plaintiff to the bank, and not to Burger, on November 24, 1915, the witness says "I had made, executed and delivered Exhibits 1 and 2 formally." He denies that the Dunham checks were ever mentioned between them until he was informed the next day of the difficulties which had arisen concerning the $4,000.00 one, but on cross-examination said "In fact, I supposed until recently that the full $10,000.00 had been deposited there (meaning the two Dunham checks) I learned only $4,000.00." This statement concerning his supposition of the disposition of the Dunham check is hardly consistent with his statement that he knew nothing about their disposition, or with his counsel's contention that he was relying solely upon his, Ross's checks, regardless of where Mr. Ross was to get the money to pay him, or on the assumption that he then had it, or that the bank would otherwise extend credit to him or Ross for it, and especially so when according to his testimony he was negotiator or agent between Ross and Dunham, knew all about the transaction, and was to get $7,500.00 from Ross' side of it, if it went through.

The witness Burger denied the truth of plaintiff's testimony pertaining to his statements to him, or any communication other than as heretofore and hereafter set forth in Burger's testimony, or that there were any personal transactions between them or any reference to any such. He says that plaintiff's first note was made payable to the bank, which the plaintiff does not deny, as well as the second two (which so show). He also says that Ross was practically a stranger to him; that he opened his first account with the bank at the same time the plaintiff did, and that he was introduced to the witness by the plaintiff. Pertaining to his giving the plaintiff permission to cneck, as he did, on the strength of the Ross checks, Mr. Burger admits that at the time plaintiff deposited the Ross checks that he might have thus asked him.

The plaintiff contends that the record discloses that the

bank in no manner predicated the crediting of the $2,500.00 Ross checks to plaintiff, upon anything but its own reliance on the account Ross maintained with it, and that it positively assured the plaintiff, through its cashier, that the Ross checks drawn on it were good. The difficulty with this position is that it ignores the testimony on behalf of the defendant. As heretofore stated, the testimony was conflicting on this question. It cannot be harmonized. It was the province of the trial court to determine who was telling the truth, and it is not the privilege of this court to disturb that finding. In commenting on this phase of it, the court said:

"From the evidence in this case the court is of the opinion that the plaintiff obtained the credit of twenty-five hundred dollars upon the 29th day of September, by reason of the deposit of the four thousand dollar check called the Dunham check, which was afterwards repudiated; and when the bank discovered that the check by Dunham, upon which it had a right to rely, and as the court finds from the evidence did rely, was repudiated in payment by the drawer of the check, that good conscience and the law ought to protect the bank against the payment of the twenty-five hundred dollars of the fund which must result, if paid, in an absolute loss to the bank."

There being evidence to support this finding, we are not at liberty to disturb it.

If we understand it correctly, the next contention of plaintiff is that when the bank received the Ross checks for deposit by plaintiff, and credited them to his account and charged them to Ross' account, that because these checks were drawn upon Ross' account at defendant bank, that it constituted a payment of them to the plaintiff by the bank, and not an extension of credit to the plaintiff; that if the Ross account proved insufficient to satisfy them, or uncertain upon account of checks deposited by him, which might be returned, that in accepting the Ross checks the credit was extended to Ross, and not to the plaintiff, and for that reason that regardless of what might thereafter happen concerning the Ross account, the bank was

not at liberty to recharge the Ross checks to the plaintiff and hence was owing him the amount sued for. This, upon the theory that when a bank accepts a check drawn on itself, either by payment or by depositing to the credit in the bank of the person presenting it, that it is presumed to know whether the check at that time is good or not, and if it accepts it, it cannot thereafter repudiate its act in this respect. The following cases are cited as sustaining this contention: *City National Bank v. Burns,* 68 Ala. 267, 44 Am. Rep. 138; *National Bank v. Burkhardt,* 100 U. S. 686, 25 L. Ed. 766; *Oddie et al. v. National City Bank,* 45 N. Y. 735, 6 Am. Rep. 160; *S. E. Trust Co. v. Huff,* 63 Wash. 225, 115 Pac. 80, 33 L. R. A. (N. S.) 1023, Ann. Cas. 1912D, 491; *National Bank v. Berrall,* 70 N. J. Law, 757, 58 Atl. 189, 66 L. R. A. 599, 103 Am. St. Rep. 821, 1 Ann. Cas. 630; *Levy v. Bank,* 4 Dall. 234, 1 L. Ed. 814; Michie on Banks and Banking, vol. 2, § 124.

Without an agreement expressed or implied or understanding directly or indirectly to the contrary, we may concede that the general rule as contended for and supported by these authorities is correct, but as said in the first of them, viz., *City National Bank v. Burns,* 68 Ala., at page 275, 44 Am. Rep. 138, "Contracts, agreements, transactions between parties should have operation and effect according to their intention." And again at page 276, "It is the intention of the parties which must govern."

In *Lumsdon v. Gilman et al.,* 81 Hun. 526, 30 N. Y. Sup. 1124, it appears that the depositor and defendant agents both knew, when the draft which was drawn on the defendant bank was offered for deposit, that the drawer was insolvent. He then had an apparent credit with the bank exceeding the amount of the draft, but afterwards an error was discovered which entirely absorbed the apparent credit. The bank's clerk testified that he accepted the draft under an agreement with plaintiff that if there was any trouble about it, it should be charged back to plaintiff's account. It was held proper to ascertain the intention of the parties and that a verdict for the defendant bank on that issue would not be disturbed. In *Arkansas Trust & Banking Co.*

*v. Bishop,* 119 Ark. 373, 375, 178 S. W. 422, at page 423, the court said:

"The only question in this case for the decision of the jury was whether the bank accepted the check and became liable to the payment of the amount for which it issued its deposit slip to the drawee thereof. The intention of the parties to the transaction could properly have been shown for the determination of this question."

In *Pollack v. Bank of Commerce,* 168 Mo. App. 368, 151 S. W. 774, it is held that a depositor may make a valid agreement with the bank that payment shall be deferred for a reasonable time until the bank can ascertain whether or not there are sufficient funds of the drawer in its hands to pay it, and that such an agreement may be established from a custom to that effect, etc. These cases, while not exactly like the one under consideration, involve somewhat similar propositions.

The court found and there is evidence from which it can properly be inferred that the plaintiff obtained the credit of the $2,500.00 evidenced by the Ross checks to him by reason of the deposit of the $4,000.00 Dunham check by Ross. This, of course, had to be under the assumption that the Dunham check would be paid, and in case it was not that the bank necessarily had the right to recharge the Ross checks to the plaintiff the same as it would have, had the Dunham check been deposited by him. When the shortage created by the Dunham check was disclosed it immediately did so; he was advised to that effect the next morning after he had deposited the Ross checks, and was requested to make good the amount of his overdraft given on the strength of this credit. In response to this demand, he voluntarily, when in possession of all the facts, acquiesced in this arrangement and gave his note and security for the overdraft which terminated in the closing of his account. His actions at that time were in harmony with the court's finding as is his testimony in part to the effect that Mr. Burger told him he could draw checks on the strength of his deposit of the Ross checks to pay other indebtedness, otherwise, if the checks were accepted as that much cash

when deposited, why the necessity of getting permission at all to check on this account.

In *Lovell v. Goss*, 45 Colo. 304, 101 Pac. 72, 22 L. R. A. (N. S.) 1110, 132 Am. St. 184, this court quotes with approval from *Manhattan Life Insurance Co. v. Wright*, 126 Fed. 82, 61 C. C. A. 138:

"The practical interpretation given to their contracts by the parties to them while they are engaged in their performance, and before any controversy has arisen concerning them, is one of the best indications of their true intent, and courts that adopt and enforce such a construction are not likely to commit serious error."

This delcaration is applicable here and is just what the trial court did. The plaintiff admits that after he was advised of both his and Ross' shortage, occasioned by the stopping of payment on the Dunham check, and after he had talked it over with a friend, that he went back to the bank the next day and gave his note (and secured it with diamonds) to represent the amount of this shortage, which did not exist, had he the right to rely upon his deposit of the Ross checks. In such circumstances, when the testimony is considered as a whole, we cannot agree that there is no competent testimony to sustain the finding of the trial court.

The judgment is affirmed.

*Affirmed.*

Mr. Justice Garrigues and Mr. Justice Scott concur.